The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.

UNITED STATES BANKRUP

NORTHERN DISTRICT (

WESTERN DIVISION

John P. Gustafson
United States Bankruptcy Judge

Dated: January 28 2025

| In Re: | ) | Case No. 24-30814 |
|---|---|---|
| | ) | |
| Parkcliffe Development, LLC | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| | ) | JUDGE JOHN P. GUSTAFSON |

**MEMORANDUM OPINION AND ORDER REGARDING STVJ LLC'S MOTIONS TO DISREGARD BREAK UP BID IN CONNECTION WITH THE SALE OF DEBTOR'S REAL PROPERTY AND FOR ORDER OF SALE TO STVJ LLC AND TO STAY AUCTION AND/OR EXPEDITE HEARING**

This cause comes before the court on the Motions of STVJ LLC ("STVJ" or the "Stalking Horse Bidder") to: 1) Disregard Break Up Bid In Connection With the Sale of Debtor's Real Property and for Order of Sale to STVJ LLC [Doc. #69]; and 2) to Stay Auction and/or Expedite Hearing [Doc. #72]. The court held a hearing on the STVJ's Motions on January 22, 2025, and the auction was temporarily stayed. An expedited Evidentiary Hearing was held on January 24, 2024, at which the court heard testimony from witnesses and argument from counsel regarding the status of the Section 363 sale of the assets of Parkcliffe Development, LLC pursuant to the Order

(I) Approving Debtor's Entry into the Stalking Horse Agreement and Stalking Horse Bid Protections; (II) Bidding Procedures and Auction; and (III) Approving the Form and Manner of Notice Thereof and (IV) Granting Related Relief [Doc. #61].

**FACTS**

Parkcliffe Development LLC ("Parkcliffe") filed a Chapter 11 case without checking the boxes electing to be treated as either a small debtor (as defined by 11 U.S.C. §101(51D)), or as a debtor proceeding under Subchapter V of Chapter 11. [Doc. #1, p. 2, ⁋8).

On the Petition, the box was checked describing Debtor's business as a "Health Care Business" (as defined in 11 U.S.C. §101(27A). [Doc. #1, p. 2, ⁋7]. Parkcliffe provides long-term residential care to residents of the two facilities it owns. On June 12, 2024, a Patient Care Ombudsman was appointed by the Office of the U.S. Trustee pursuant to 11 U.S.C. §333. [Docs. ##9 & 21, 22].

The court held three status conferences in this case pursuant to 11 U.S.C. §105(a). [Docs. ##14, 25, 27, 35, 36, 48, 52 & 59]. Debtor represented that the local demand for long-term care had weakened, that the number of persons in residence had declined, and that it was unclear how long the Debtor could maintain operations given its cash flow and cash reserves. On the other hand, the reports from the Patient Care Ombudsman were very positive regarding the care the residents were receiving during the Chapter 11.

As the case progressed, the finances appeared to stabilize to some degree, although the ability to continue operations remained deeply concerning.

From the beginning of the case, this appeared to be a liquidating Chapter 11 where the sale would be conducted expeditiously. To that end, on August 16, 2024, Debtor's counsel filed an

Application for Employment and Retention of Rob Keleghan and Signature Associates[1] as Realtor/Brokers of the Debtor ("Application"). [Doc. #41]. The Application stated that Signature was selected "based upon his qualifications and expertise in selling property of the type of the Real Property in this geographic area." [*Id*., at p. 2]. Employment of Signature was granted on an expedited basis. [Docs. ##42, 43, 49 & 50].

On the same day, August 16, 2024, Debtor filed a Motion for Entry of an Order (A) Authorizing the Debtor to Enter into the Stalking Horse Agreement and Stalking Horse Bid Protections (B) Approving the Bidding Procedures, (C) Approving the Form and Manner of Notice Thereof and (D) Granting Immediate Related Relief. [Doc. #39]. This Motion had a proposed Order granting the relief requested, and attached the Asset Purchase Agreement by and between Parkcliffe Development, LLC and STVJ LLC. [Docs. ##39-1 and 39-2]. The Debtor also requested that time for approval of the Motion be shortened. [Docs. ##40, 44 & 46].

After a Status Conference was held on August 22, 2024, it was understood that the deadline for objections to the proposed sale would be vacated. [Doc. #48]. On October 22, 2024, Debtor's Amended Motion for Entry of an Order (A) Authorizing the Debtor to Enter into the Stalking Horse Agreement and Stalking Horse Bid Protections (B) Approving the Bidding Procedures, (C) Approving the Form and Manner of Notice Thereof and (D) Granting Immediate Related Relief was filed. [Doc. #54]. The court set the Amended Motion for hearing on November 12, 2024. [Doc. #55].

On November 12, 2024, the Office of the U.S. Trustee filed an Objection to Debtor's Proposed Bid Procedures. [Doc. #57]. The same day, the U.S. Trustee withdrew its Objection

---

[1]/ Hereinafter "Signature".

[Doc. #58] and the Amended Motion was granted, allowing the Debtor to enter into the Stalking Horse Agreement. [Docs. ##60 & 61].

The Stalking Horse bid of STVJ was $2.2 Million, and included a number of other provisions related to the offer. [Doc. #39-2].

There were two parts to the Order Approving Debtor's Entry into the Stalking Horse Agreement and Stalking Horse Bid Protections (II) Bidding Procedures and Auction, (III) Approving the Form and Manner of Notice Thereof and (IV) Granting Related Relief (hereinafter "Stalking Horse Order") [Doc. #61]: 1) the Order; and 2) the attached "Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of Debtor's Real Property and Acquired Assets. [*Id*., Exhibit 1, pp. 6-13]. The Stalking Horse Order provides: "17. In the event of any inconsistencies between this Order and the Motion and/or the Bidding Procedures, this Order shall govern." [*Id*., p. 5, ⁋17].

The Stalking Horse Order has another provision that appears to be intended to aid in its interpretation. In the first paragraph after the statement that the Motion is granted, the Stalking Horse Order states that it is: "designed to maximize the recovery on, and realizable value of Debtor's Real Estate." [*Id*., at p. 2, ⁋2].

There is also some flexibility built into the Stalking Horse Order: "The Debtors[2] [*sic*] are authorized to take any and all actions necessary to implement the Bidding Procedures. Subject to the terms of the Bidding Procedures, the Debtors [*sic*] may modify the Bidding Procedures as necessary or appropriate to maximize value for their estates [*sic*]." [*Id*., p. 4, ⁋12].

2/ There is only one Debtor in this case, and there is only one estate.

Finally, the Stalking Horse Order states that "This court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order." [*Id*., p. 5, ⁋21].

Attached to the Stalking Horse Order is Exhibit 1, Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of Debtor's Real Property and Acquired Assets (hereinafter "Bidding Procedures"). [Doc. #61, Exhibit 1, pp. 6-13].

STVJ's Motions rely, in large part, on the failure to comply with the requirements of Paragraph 4 of the Bidding Procedures. The introductory paragraph to that document states: "To participate an Acceptable Bidder must deliver to Signature an irrevocable offer for the Real Property (a "Bid"), which shall meet the following criteria, in each case of either the First Bid Deadline and the Final Bid Deadline (as defined above)." [Doc. #61, Exhibit 1, p. 8].

No evidence was presented that any of the terms in Paragraph 4 were specifically negotiated. Rather, they appear to have originated from Debtor's counsel and were included in the STVJ Stalking Horse bid.

The definition of "Qualified Bid Requirements" in Paragraph 1, states as follows:

> 1. The Stalking Horse Agreement Bid Protections and Breakup Bid Requirements.
>
> STVJLLC ("the Stalking Horse") has agreed to purchase the Real Property and Acquired Assets for Two Million, Two Hundred Thousand Dollars ($2,200,000.00), but permit the solicitation by Signature for bids on behalf of the Debtor for a thirty (30) day period which would expire on December 12, 2024, ("the First Bid Deadline"), but the initial bid must be at least $200,000 more than the STVJLLC Bid in order to break up the stalking horse agreement. ("the Breakup Bid") Therefore any bid submitted before or on December 12, 2024, must be at least $2,400,000.00 and meet all of the criteria set forth in Paragraph Three (3) below.

This provision does not reference the requirements in Paragraph 4 at all. It may be that the reference to "Paragraph Three (3)" should have been Paragraph 4 – but that is not what it said in

either the initial filing [Doc. #39-1, p. 7, ⁋1], the Amended filing [Doc. 54-2, p. 2, ⁋1], or in the Exhibit 1 to the Stalking Horse Order that was approved and entered by the court. [Doc. #61, p. 7, ⁋1].

For purposes of the Breakup Bid Requirements in Paragraph 1, there were two clear requirements: the amount of the offer – exceeding the "STVJLLC" bid by at least $200,000 – and the timing: received by December 12, 2024. The reference to Paragraph 3 is to a paragraph that deals with "Lack of Receipt of a Qualified Breakup Bid". [*Id*.]. It adds no material requirement to the Breakup Bid requirement. There is no "time is of the essence" provision in either the Stalking Horse Order or in Exhibit 1.

Two "Breakup Bids" were received prior to the December 12, 2024 deadline. These two bidders will be referred to as "Doctor 1" and "Doctor 2". STVJ asserts that both bids were non-compliant with the provisions of Paragraph 4 of Exhibit 1. Evidence was presented as to the non-compliance at the evidentiary hearing. There is no question that the two bids did not comply with all of – or even most of – the many requirements in Paragraph 4. It is also clear that both Doctor 1 and Doctor 2 are no longer part of the Stalking Horse bid process – having dropped out after making their bids. However, the Stalking Horse Order did not require that the offers of the original breakup bidders continue in order to consider new bids resulting from the post-breakup bid marketing of the Parkcliffe properties.

The first bid received was on a form that mirrored, to a large extent, the offer made by STVJ. It was the only bid received that was based on STVJ's bid, and therefore the only one that bears any close relationship to the detailed requirements that are set forth in Paragraph 4. The bid was for $2,400,000, topping STVJ's bid by the required $200,000.

Focusing on the two main objections of STVJ to the bid of Doctor 1: first, the deposit of $100,000 was not made with Louisville Title Agency[3]; and second, there is an inspection contingency that was added to the language contained in STVJ's offer. [Doc. 66-1, p. 16, ⁋6.5]. However, the offer also reflects that an "INDEPENDENT INSPECTION" has already occurred (based on language apparently copied from the STVJ offer). [Doc. #66-1, p. 19, ⁋8.0].

As to the lack of a $100,000 deposit made with Louisville Title Agency, that is not what the language of the Stalking Horse Order and Exhibit 1 actually require in terms of a deposit. Instead, it appears that the requirement for a "Good Faith Deposit" under Paragraph 4 is for .02% of the bid.[4] [Doc. #61, p. 4 ⁋13; p. 8, ⁋4(a)]. Thus, if the bids for these properties got as high as $3 Million, the required deposit would be $600. While the various bid participants apparently took various steps to make a $100,000 deposit, that requirement is not part of the Stalking Horse Order, and it is difficult to see how the failure to properly deposit .02% of $2,400,000 (a deposit, by the court's calculation, of $480) is sufficiently material for the Debtor and the court to disregard Doctor 1's bid.

On December 12, 2024, based upon the receipt of Doctor 1's bid, the Debtor filed a Notice of Receipt of a Breakup Bid in Connection with the Sale of Debtor's Real Property. [Doc. #66]. For more than a month, STVJ did not file anything indicating that they did not accept the Breakup Bid. On January 13, 2025, the Motion to Disregard Break Up Bid in Connection with the Sale of Debtor's Real Property and for Order of Sale to STVJ LLC was filed. [Doc. #69]. This was the

---

[3]/ At some point, Debtor apparently changed (or sought to change) the title company to AREA Title Company.

[4]/ Paragraph 4(a) states: "A cash deposit in an amount equal to .02% of the purchase price of the Bid to be held in an escrow account with the Louisville Title Agency, 3306 Executive Pkwy #205, Toledo, Ohio (the "Good Faith Deposit"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals .02% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction."

same day as the last day of the Final Bid Deadline. STVJ's explanation for the delay in filing any response to the Notice was that they were not represented by counsel in the Stalking Horse process.

If the overall poor drafting of the Stalking Horse Order was bad, the execution of the Stalking Horse proceeding by the bankruptcy professionals was worse.

While Doctor 1's bid was prepared by an attorney and was based on STVJ's offer, the other offers were not. Doctor 1's bid was the only one that was publicly disclosed or provided to Debtor's counsel by Signature, based on confidentiality provision in the Stalking Horse Oder. All of the other offers (including the offer of Doctor 2) were on an offer form prepared by Signature. Although Signature's representative testified it had received the Stalking Horse Order, instead of incorporating the terms of the Order into the bid forms it prepared, it used its own boilerplate form that bore almost no relation to the STVJ offer, or the requirements of Paragraph 4 of the Stalking Horse Order.

Signature's representative stated that the Stalking Horse Order was part of the "bid package" in a "drop box" provided to potential bidders – but that bid package was never entered into evidence at the January 24, 2025 Evidentiary Hearing.

The form prepared by Signature did not have a place to disclose the members of the LLCs making the offer, did not waive a jury trial, did not provide financing information, did not assert the absence of collusion, did not agree to be a backup bidder, did not waive any claim for a breakup fee or expenses, etc. It also included typed in dates, which became a problem as the stalking horse process moved from breakup bid deadline to the "Final Bid Deadline" on January 13, 2025. The Signature form also included additional non-compliant terms, such as inspection rights.

Signature's representative stated that he sent the form to Debtor's counsel before it was used. Debtor's counsel stated he had not seen the Signature form until after STVJ's Motions were filed. This issue will be explored further in future hearings on the fees of Debtor's counsel and Signature.

The stalking horse process outlined in the Stalking Horse Order contemplated a marketing period if there was a Qualified Break Up Bid, as set forth in Paragraph 1. [Doc. #61, p. 7, ⁋2]. Paragraph 2 provides:

> 2. Receipt of a Breakup Bid.
>
> If a Qualified Breakup Bid is received on or before the thirty (30) days, then the Stalking Horse Agreement provides that Signature may continue to solicit additional bids for another thirty days which would be January 13, 2025. ("the Final Bid Deadline") The identity of all bidders will be made public if a Qualified Breakup Bid is received, but only the lowest Qualified Breakup Bid will be made public on December 12, 2024.

There were several subsequent bids submitted – all on the defective form created by Signature. At some point, Doctors 1 and 2 dropped out. Other parties made bids, and some then apparently lost interest. At the Evidentiary Hearing, the court heard telephonic testimony from Mr. Ranjit Singh, who testified that he is the sole member of Spectranet Holdings LLC (hereinafter "Spectranet"), which appears to be a Delaware LLC.

Spectranet submitted a bid of $2,650,000 using a form created by Signature. In addition to all the other defects in the Signature form, the language stated that an irrevocable offer is being made terminated on a date prior to the offer being made. [Exhibit G, p. 3, ⁋14](it is a continuing offer "until 5:00 p.m., December 12, 2024", but the offer was signed on 1/13/2025). Mr. Singh testified that he was not represented by counsel in preparing the offer.

Mr. Singh further testified (with some language issues) in response to questions from Debtor's counsel, that he would comply with all of the provisions in Paragraph 4 of the Bid Requirements. Also submitted was evidence of Spectranet's ability to fund the purchase of Debtor's assets up to "$4.5M USD" at any time for the transaction. [Debtor's Exhibit 2].

On cross-examination, it was revealed that – at the time of the January 24, 2025 Hearing – Spectranet was not licensed to do business in the State of Ohio.

The court also heard testimony from one of STVJ's members regarding the time they had put in on this purchase, and that the $50,000 break up fee would not fully compensate them for their time.

**LAW AND ANALYSIS**

The case law is strongly weighted in favor of the court ordering the Auction to proceed. Early in the Evidentiary Hearing, the court requested that counsel for the Stalking Horse Bidder provide what cases he could point to that supported his client's position. Counsel cited: *In re Gil-Bern Ind., Inc.*, 526 F.2d 627, 629 (1st Cir. 1975)("If there is no local custom to the contrary, we are in accord with the established rule that it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed."); *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761 (7th Cir. 2004)("We decline to draw from *Gil–Bern* a hard and fast rule precluding a bankruptcy court from entertaining an upset bid on a debtor's property once an auction has concluded or the deadline for offers has passed."); and *In re Bigler, LP*, 443 B.R. 101 (Bankr. S.D. Tex. 2010)("the rule from *Gil–Bern* maintains its vitality: an unimpeachably-conducted auction based on clear procedures may not be reopened solely for the reason of a higher

bid after the close of the auction. If anything, *Gil–Bern's* holding is in harmony with the Seventh Circuit's holding.").

It should be noted that *Gil-Bern* is a case decided under the Bankruptcy Act, not the Bankruptcy Code, and that the cases cited by STVJ deal with situations where there was an auction, not a Stalking Horse bid procedure leading up to an auction. Moreover, in a subsequent decision, the First Circuit Court of Appeals stated that while it would not approve a bankruptcy court's refusal to confirm a sale lightly, "[t]he bankruptcy court must be accorded sufficient discretion to decide the truly close cases as best it can in view of these competing considerations." *In re Muscongus Bay Co*., 597 F.2d 11, 13 (1st Cir. 1979)(upholding bankruptcy court's determination to reject highest auction bid, reopen bidding, and accept highest subsequent sealed bid in a case also decided under the Bankruptcy Act.).

*Gil-Bern* does make the point, that this court believes is important, there is a balancing that the court should consider between obtaining the highest price, and undermining confidence in bankruptcy sale proceedings. As *Gil-Bern* argues: "It might not only be thought improper for a bankruptcy court to proceed in an irregular fashion merely to gain a few extra dollars in one case, but in the long run such a practice would be penny wise and pound foolish. Creditors in general would suffer if unpredictability discouraged bidders altogether. At the least such practices might encourage low formal bids." *Gil-Bern*, 526 F.2d at 629.

This view is echoed, with some differences, in *In re Farmland Ind., Inc*., 289 B.R. 122, 126 (8th Cir. BAP 2003):

> A bankruptcy court has considerable discretion in approving assets sales and is granted ample latitude to strike a balance between fairness, finality, integrity, and maximization of assets. *Wintz v. Am. Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir.2000); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn,*

> *Inc.)*, 107 F.3d 558, 565–66 (8th Cir. 1997). The court must consider the bidders' reasonable expectations to encourage confidence in the process. Finality and regularity are important because they encourage interested parties to sincerely extend their best and highest offers. On the other hand, the court must be mindful of the interests of unsecured creditors and the goal of maximizing the value of the bankruptcy estate. *Food Barn*, 107 F.3d at 565–66. Prior to entry of an order confirming a sale, the court has broad discretion to conduct sales in the manner it deems most appropriate. *Brink v. Payless Cashways, Inc. (In re Payless Cashways, Inc.)*, 281 B.R. 648, 652 (8th Cir. BAP 2002).

The majority of the case law does not follow *Gil-Bern's* prohibition, even as it applies to auctions. And the finality and regularity factors are, in this court's view, to be given somewhat lesser weight in a stalking horse situation leading up to an auction, as opposed to an actual auction. *Cf.*, *In re Bigler, L.P.*, 443 B.R. at 113 (arguing that the absence of a stalking horse procedure made the upset of an auction more improper, because in a stalking horse proceeding, bidder would have known it could be outbid at the sale hearing and it could have protected itself with a breakup fee).

One of the leading cases in this area is *Consumer News and Business Channel Partnership v. Financial News Network Inc. (In re Financial News Network Inc.)*, 980 F.2d 165 (2nd Cir. 1992), a case in which the Second Circuit Court of Appeals affirmed the bankruptcy court's reopening of the auction for a higher bid. As the Court of Appeals stated: "this process best balanced the competing considerations of finality in the bidding process and fairness to the bidders against the interests of creditors in securing the highest sales price. There are cases where the bankruptcy court's discretion must be sufficiently broad so that in making its decision it can compass these competing considerations as best it can." *Fin. News Network Inc*., 980 F.2d at 170.

In a case where the debtor sought to change the stalking horse bidder after agreement, but before court approval, the *Metaldyne* court quoted *Fin. News Network*'s statement that it cautioned that courts should not follow "'such rigid adherence to the procedures that govern the sale as to

elevate them over the substance of a bankruptcy court's principal responsibility, which is to secure for the benefit of creditors the best possible bid.' *Id*. 'To hold otherwise would seriously compromise the necessarily broad discretion of the bankruptcy court.' *Id*. at 170." *In re Metaldyne Corp*., 409 B.R. 661, 669 (Bankr. S.D.N.Y. 2009).

The *Metaldyne* court also quoted from the decision in *In re Global Crossing Ltd*., 295 B.R. 726, 745 (Bankr. S.D.N.Y. 2003): "'If this Court were to believe, for half a second, that the Debtors spurned a better offer to the detriment of their fiduciary duties, this Court would not hesitate to invoke its powers.' *Id*. This Court agrees." *Metaldyne*, 409 B.R. at 668; *see also*, *In re Broadmoor Place Inv., L.P.*, 994 F.2d 744, 746 (10th Cir. 1993)("we hold that a Bankruptcy Court in a case such as this does have the power to disapprove a proposed sale recommended by a trustee or debtor-in-possession if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable.").

As the *Metaldyne* court stated: "Once another bidder entered the fray with a potentially higher and better offer, the Debtors had to consider the offer; failure to do so would have been a breach of their duties to the estate and its creditors." *Metaldyne*, 409 B.R. at 699.

Many courts have recognized that debtors, "in conducting the sale process, have a fiduciary duty to maximize the value of their estates." *In re Family Christian, LLC*, 533 B.R. 600, 621 (Bankr. W.D. Mich. 2015); *see also*, *Sugarloaf Indus. & Mktg. Co. v. Quaker City Castings, Inc. (In re Quaker City Castings, Inc.)*, 2005 WL 3078607 at *7, 2005 Bankr. LEXIS 2211 at *23 (6th Cir. BAP Nov. 18, 2005)("when a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."); *In re Mountain States Rosen, LLC*, 619 B.R. 750, 754 (Bankr. D. Wyo. 2020)("Regardless of a debtor's discretion, debtors, in conducting the sale process, have a fiduciary duty to maximize the

value of their estates."); *In re New Era Resorts, LLC*, 238 B.R. 381, 387 (Bankr. E.D. Tenn. 1999); *In re Integrated Resources, Inc*., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992)("When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold.").

While it is the Debtor's fiduciary duty to consider such offers, courts have also asserted their authority to ensure that a sale other than in the ordinary course of business achieves the highest and best price. As the bankruptcy court stated in *Watertech Holdings*:

> [A] Bankruptcy Court ... does have the power to disapprove a proposed sale recommended by a trustee or debtor-in-possession if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable." *In re Broadmoor Place, Inv., L.P.*, 994 F.2d 744, 746 (10th Cir. 1993); *see also In re Sunland, Inc*., 507 B.R. 753 (Bankr. D.N.M. 2014) (reopening bidding to consider a late bid that was approximately 20% higher than any other bid); *In re Muscongus Bay Co*., 597 F.2d 11 (1st Cir. 1979) (affirming a bankruptcy court's decision to consider a late bid that was approximately 20% higher than the only timely bid submitted); *In re Food Barn Stores, Inc*., 107 F.3d 558 (8th Cir. 1997) (affirming a bankruptcy court's decision to consider a late bid that was approximately 31% higher than the highest timely bid); *In re GGSI Liquidation, Inc*., 280 B.R. 425 (N.D. Ill. 2002), *aff'd* 368 F.3d 761 (7th Cir. 2004)(finding a bankruptcy court did not abuse its discretion when it consider a late bid that was 16% higher than the winning bid at auction).

*In re Watertech Holdings, LLC*, 619 B.R. 324, 334 (Bankr. D.S.C. 2020); *see also*, *In re Wintex*, 158 B.R. 540 (D. Mass. 1992)("In the present case, Markham submitted a *timely* higher bid. Although the bid did not conform to the terms of the Notice of Intended Private Sale, I do not consider Markham's failure in this regard to be equivalent to a failure to submit a bid at all (within the time frame permitted).")(emphasis in original).

As in several of the cases where late bids have been allowed, this court has not entered an Order approving the Debtor's sale of its assets. *See e.g.*, *In re Watertech Holdings, LLC*, 619 B.R.

at 333; *Corporate Assets, Inc. v. Paloian*, 368 F.3d at 769 ("We have repeatedly cited the entry of a sale order as the point at which the court loses much of the discretion it otherwise enjoys in deciding whether to confirm the results of the auction and at which it must be able to identify a compelling reason in order to recognize a late bid.").

The Stalking Horse Order approved a sale process, not the sale itself. No hearing was scheduled or held regarding the adequacy of the price to be paid for Debtor's real estate assets. Even if the court held that STVJ LLC was the only bidder permitted to go forward with its offer, court approval of the sale was still required. [Doc. #61, p. 12]. To the extent the Bidding Procedures [Doc. #61, p. 7, ⁋3] may suggest that the court would be obligated by the word "shall" to enter a Sale Order without notice and the opportunity to object at a hearing, such a provision would be inconsistent with 11 U.S.C. §363 and is not binding on this court. As the Bidding Procedures state: "Any Sale will be implemented pursuant to section 363 of the Bankruptcy Code . . . ." [Doc. #61, p. 6].

One argument of STVJ's counsel was premised on this alleged late-bid situation being essentially an unusual outlier. Unfortunately, it is not. The *Bigler* court quoted testimony from debtor's counsel, stating that: "Late bids are part of our business. We, chapter 11 lawyers, may feel a little uncomfortable with them, we may not be able to pigeon-hole them within exact provisions of bid procedures, but the inevitable fact of life is that late bids are part of our business." *In re Bigler*, 443 B.R. at 115. The court stated that: "there is little doubt that this comment was right on the mark." *Id*. The question is whether it is better to address late bids with harshness, to discourage them, or with flexibility, to accommodate the messy realities of the bankruptcy marketplace.

And again, it is a different equation in evaluating a stalking horse proceeding and an auction. As *Watertech* noted: "The very role and value of a stalking horse bidder is to indicate to

others that the assets being sold have value - at least in the eyes of the stalking horse bidder. It is this expression of value that is intended to attract other buyers to a competitive bidding process. Likewise, a stalking horse should expect that it may be outbid. It is for this reason that a stalking horse negotiates buyer protections, such as the reimbursement provisions contained in the APAs for WAAG in this case." *Watertech*, 619 B.R. at 337.

Here, the weighing of interests is not just whether stalking horse bidders will be deterred, it is also whether secured creditors will be deterred from cooperating with debtors entering the Chapter 11 arena if they cannot be assured of receiving value for their collateral. Further, there are the interests of the bidders whose bids STVJ asks the court to disregard based on defective bid forms that they were given by the bankruptcy professionals who were supposed to ensure that their bids were compliant.

In terms of weighing these interests, cases dealing with the protection of the integrity of bankruptcy auctions appear to be somewhat less than fully applicable to this case, where a stalking horse bid process was used. Auctions are certainly the most important sale method used by the bankruptcy courts to sell all kinds of property. Stalking horse sales are less commonly used, generally reserved for more difficult liquidation situations. Moreover, in the stalking horse process, the stalking horse bidder can protect itself by negotiating terms – the most important protection being a "breakup fee", a court approved cash payment if there is a breakup bid.[5] In protecting the finality of the auction process, courts are protecting the integrity of a bedrock sales method where the bidders come into a process with set rules that they generally cannot change.

---

5/ Courts have also, more infrequently, approved expense reimbursement provisions, and "topping fees" (awarding a percentage of the overbid amount to the stalking horse bidder). It appears that neither of those types of fees were ever included in the Stalking Horse Order in this case, or any of the earlier proposed orders.

And yet, the case law demonstrates that even with auction sales, finality can be fluid, and bids that were clearly late have been accepted over the objections of timely bidders.

The stalking horse process is inherently less regimented than the auction process. It is intended to develop interest in the property being sold and draw higher bids for the property being offered for sale. It is also usually a multi-step process, as it was here. The final step being a sale under Section 363 of the Bankruptcy Code. It is important to remember that in this process, the court still has to approve the sale of the property, either to the stalking horse bidder, or to one of the subsequent bidders. If the stalking horse process is completed without any bidders stepping forward to bid on the property, that is strong evidence that the property is being sold for "value". Where, as here, there is another bidder – Spectranet – offering a significantly higher price, the evidence provided by the stalking horse process, to support "value", is greatly lessened. An "adequate price" is one element that must be found in order for a Section 363 sale outside the ordinary course of business to be approved. *See e.g.*, *In re Nicole Energy Services, Inc*., 385 B.R. 201, 231 (Bankr. S.D. Ohio 2008); *In re Country Manor of Kenton, Inc*., 172 B.R. 217, 220-221 (Bankr. N.D. Ohio 1994)(denying proposed sale of a nursing home based, in part, on inadequate price). While a bankruptcy court may place great weight on the business judgment of the debtor[6]

---

6/ A debtor's business judgment is discussed in *160 Royal Palm*:

> The trustee or debtor-in-possession's "management of the procedural details surrounding bidding and sale are 'ultimately a matter of discretion that depends upon the dynamics of the particular situation.'" *In re Phillips*, Case No. 2:12-cv-585-FTM-29, 2013 WL 1899611, at *10 (M.D. Fla. May 7, 2013) (quoting *In re Nuttery Farm, Inc*., 467 F.App'x 711, 712 (9th Cir. 2012) ). Therefore, the debtor "is entitled to exercise [its] 'business judgment' in deciding which bid to accept, and this business judgment is entitled to 'great judicial deference.'" *Id*. (quoting *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ). Notably, the debtor-in-possession may exercise its business judgment in accepting a "lower monetary bid." Id. (citing *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ). "A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business

in evaluating the adequacy of the price to be paid, it appears under the present circumstances, the Debtor would join the secured creditor in opposing a sale for the amount of the Stalking Horse bid. Moreover, it appears that – if it believed the Spectranet offer was superior to the Stalking Horse bid – it would have a fiduciary duty to take that position.

While protection of the finality of an approved bankruptcy sale is protected by provisions such as Section 363(m), the initial determination of whether to approve a sale under Section 363(b) is not tilted toward rote approval. Going to a hearing on approval of the proposed sale of Debtor's assets under Section 363, with a strong objection based on the adequacy of the price, could lead to the worst of all possible outcomes: rejection of the Stalking Horse bid as inadequate, the Debtor running out of money, and the vulnerable residents of these facilities having to find a new place to live in the dead of winter.

Moreover, the sale process here – although not well drafted – contemplates several steps leading up to an actual auction sale. Stalking horse bidding process is not, itself, an auction. It is a process that either leads to an auction, or leads to a hearing on court approval (or rejection) of the Stalking Horse bid made by STVJ. The court finds that the even granting all of the defects that STVJ's counsel pointed out in each of the offers, the proper course is to move to the auction phase. The court notes that as to the second phase of the bidding, and the offers received after the breakup bid, STVJ's first filing, raising these issues, was filed on the date of the second bid deadline, January 13, 2025. [Doc. #69].

---

judgment, but only on bad faith, or whim or caprice." *In re SW Boston Hotel Venture, LLC*, 2010 WL 3396863, at *3.

*In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D. Fla. 2019)(affirming bankruptcy court's decision to withdraw the stalking horse sale procedure, and approving a private sale for a higher price where no other bids were permitted.)

Counsel for STVJ also raised concerns about how allowing non-conforming bids could result in a fraudulent inflation of the amount that would eventually be paid for the property.[7] The court does not find that argument persuasive. In that regard, it should be noted that all of the net proceeds generated by the sale are going to be applied to the undersecured loan of United Midwest Savings Bank on its mortgage. It is difficult to see how any conspiracy to inflate a sale price, which would have to involve both the two Doctors and the Bank, could be seriously considered as a possible basis for granting STVJ the relief it has requested. There is a specific provision, Section 363(n), which allows sales to be avoided, and sanctions awarded, in the event of collusion. It also appears that federal criminal law provisions may be applicable, including Title 18 §§152(3) & (6); 157(2) & (3). No evidence of any collusion was presented at the Evidentiary Hearing, and the court gives this argument no weight.

For all of the above reasons, the court holds that the Stalking Horse Order should be interpreted according to its intended purpose: "to maximize the recovery on, and realizable value of Debtor's Real Estate." [*Id*., at p. 2, ⁋2].

In so ordering, this court expects the auction bidding to be based on a new written submission confirming the testimony of Mr. Singh regarding the terms of the Spectranet bid, as mirroring the STVJ bid in all material respects. If there is another bidder wishing to participate, specifically Soul Path Housing LLC (Exhibit F), it must also enter into a written offer that mirrors STVJ Stalking Horse bid terms.

---

7/ In bankruptcy situations, bidding collusion concerns are typically focused more on bids being artificially low, rather than artificially high. *See e.g*., *Boyer v. Gildea*, 374 B.R. 645, 662 (N.D. Ind. 2007)(" The rule prohibiting collusive conduct in bidding is intended to protect creditors by ensuring a competitive bidding situation, resulting in a higher price for assets.").

Notwithstanding the language of the Stalking Horse Order re: the required good faith deposit, bidders will be required to have delivered a $100,000 deposit to AREA Title Company at least 48 hours prior to the auction being held. (*See*, footnote 3).

Debtor is directed to set up the auction process, and conduct an auction pursuant to this decision and the procedures outlined in the Stalking Horse Order.

For the reasons stated above, **IT IS ORDERED THAT** the Motions of STVJ LLC ("STVJ" or the "Stalking Horse Bidder") to: 1) Disregard Break Up Bid In Connection With the Sale of Debtor's Real Property and for Order of Sale to STVJ LLC [Doc. #69]; and 2) to Stay Auction and/or Expedite Hearing [Doc. #72] be, and are hereby, Denied.

**IT FURTHER ORDERED THAT** the auction sale shall be reset as expeditiously as possible, consistent with the court's instructions above.